## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CARLOS MORALES, Derivatively on Behalf of Nominal Defendant LIVEPERSON, INC., | ) ) ) ) | |
| | ) | Case No. 24-5297 |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| ROBERT LOCASCIO, JOHN COLLINS, PETER BLOCK, ERNEST CU, BRUCE HANSEN, KEVIN C. LAVAN, JILL LAYFIELD, FRED MOSSLER, VANESSA PEGUEROS, WILLIAM G. WESEMANN, and YAEL ZHENG, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| LIVEPERSON, INC., | ) ) | |
| Nominal Defendant. | | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Carlos Morales ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant LivePerson, Inc. ("LivePerson" or the "Company"), brings this Verified Stockholder Derivative Complaint against Robert LoCascio ("LoCascio"), John Collins ("Collins"), Peter Block ("Block"), Ernest Cu ("Cu"), Bruce Hansen ("Hansen"), Kevin C. Lavan ("Lavan"), Jill Layfield ("Layfield"), Fred Mossler ("Mossler"), Vanessa Pegueros ("Pegueros"), William G. Weseman ("Weseman"), and Yael Zheng ("Zheng") (collectively, the "Individual Defendants" and, together with LivePerson, "Defendants") for and among other things, breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own

1

acts, and upon information and belief, including a review of publicly available information, including filings by LivePerson with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, securities analysts' reports, investor conference call transcripts and announcements made by Defendants, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought against certain LivePerson officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between May 10, 2022 and March 16, 2023, inclusive (the "Relevant Period").

2.      LivePerson is a global technology company that describes itself as "the enterprise leader in digital customer conversations." The Company's Conversational Cloud software platform allows consumers to message companies and brands using a combination of both artificial intelligence-powered chatbots and human customer service staff.

3.      In February 2022, LivePerson acquired WildHealth, Inc. ("WildHealth"), a precision medicine service that claims to leverage advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide users with a comprehensive, personalized health care plan. WildHealth regularly receives reimbursements from Medicare programs for providing certain services.

4.      In November 2022, WildHealth was informed that certain reimbursements for its services provided under a Medicare demonstration program regarding COVID-19 testing (the "Program") were suspended pending further review.

5.      However, Defendants failed to disclose to investors that WildHealth's Medicare reimbursements under the Program were suspended, instead representing to investors that, among other things, LivePerson "expect[ed] continued strong performance by WildHealth" and that there were no material changes in LivePerson's internal control over financial reporting.

6.      On February 28, 2023, the truth began to emerge when LivePerson filed a notice of late filing on Form 12b-25 with the SEC regarding its Annual Report on Form 10-K (the "2022 10-K") for the 2022 fiscal year. The Form 12b-25 disclosed that, because of LivePerson's acquisition of WildHealth, "the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures."

7.      On this news, LivePerson's stock price fell $1.69 per share, 14.31%, from a closing price of $11.81 on February 27, 2023 to a closing price of $10.12 per share on February 28, 2023.

8.      Then, on March 6, 2023, LivePerson filed a current report on Form 8-K with the SEC, which disclosed that "the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review."

9.      On this news, LivePerson's stock price fell $0.78 per share, or 6.8%, from a closing price of $11.47 per share on March 6, 2023 to a closing price of $10.69 per share on March 7, 2023.

10.     On March 15, 2023, LivePerson issued a press release announcing the Company's financial results for the fourth quarter of 2022. The press release disclosed that "[t]otal revenue

was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period

last year," and "[w]ithin total revenue, business operations revenue for the fourth quarter of 2022

decreased 1% from the comparable prior-year period to $113.0 million, and revenue from

consumer operations decreased 3% from the comparable prior-year period to $9.4 million."

11.    The next day, March 16, 2023, LivePerson filed its 2022 Form 10-K with the SEC,

which disclosed that, "due to certain control deficiencies which aggregated to a material weakness

in the Company's internal control over financial reporting as further described below, our disclosure

controls and procedures were not effective as of December 31, 2022," and "[t]he control

deficiencies, which in aggregate constitute a material weakness, were identified in connection with

the Company's previously disclosed review of certain transactions related to its subsidiary

WildHealth."

12.    On this news, LivePerson's stock price dropped $5.64 per share, or 57.73%, from

a closing price of $9.77 per share on March 15, 2023 to a closing price of $4.13 per share on March

16, 2023.

13.    On July 12, 2023, LivePerson announced that Defendant LoCascio, LivePerson's

then-Chief Executive Officer ("CEO"), would be departing the Company effective December 31,

2023.

14.    On August 8, 2023, LivePerson announced that Defendant Collins, LivePerson's

then-Chief Financial Officer ("CFO"), had been appointed as interim CEO, and that Defendant

LoCascio had stepped down as CEO and as a director effective August 7, 2023.

15.    Throughout the Relevant Period, the Individual Defendants made and/or caused

LivePerson to make false and misleading statements that failed to disclose, *inter alia*, that: (1)

LivePerson's internal controls pertaining to disclosure controls and procedures were materially

ineffective; (2) LivePerson failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, LivePerson failed to disclose the suspension of WildHealth's Medicare reimbursements under the Program and the corresponding impact on the Company's future revenues; and (4) as a result of the foregoing, LivePerson overstated its business prospects and overall financial position.

16.    In light of the Individual Defendants' misconduct, the Company as well as Defendants LoCascio and Collins were named as defendants in a federal securities class action lawsuit in the United States District Court for the Southern District of New York, captioned *Damri v. LivePerson, Inc.*, Case No. 1:23-cv-10517- PAE (S.D.N.Y.) (the "Securities Class Action"). The Securities Class Action has further subjected LivePerson to the need to undertake internal investigations and the need to implement adequate controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b), 14(a), 20(a), and 21D of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a)(1), 78t(a), and 78u-4(f)) and Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5 and 240.14a-9) promulgated by the SEC.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1401 because

LivePerson's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

21.    Plaintiff is a current stockholder of LivePerson and has continuously held LivePerson stock at all relevant times.

22.    Nominal Defendant LivePerson is a Delaware corporation and its principal executive offices are located at 475 10th Avenue, 5th Floor, New York, New York 10018. The Company's shares trade on the NASDAQ under the ticker symbol "LPSN."

23.    Defendant LoCascio founded LivePerson in 1995. From 1995 through August 2023, Defendant LoCascio served as LivePerson's CEO and Chair of the Board. Defendant LoCascio resigned from both positions effective August 7, 2023. According to the proxy statement filed on Schedule 14A with the SEC on September 8, 2023 (the "2023 Proxy Statement"), for the 2022 fiscal year, Defendant LoCasio received $2,955,255.00 in total compensation from the Company. As of March 31, 2024, Defendant LoCascio beneficially owned 3,347,401 shares of LivePerson's common stock.

24.    Defendant Collins has served as LivePerson's CFO since February 2020 and as Chief Operating Officer ("COO") since January 2024. Defendant Collins previously served as Interim CEO from August 2023 until January 2024 and as Senior Vice President of Quantitative Strategy from September 2019 until February 2020. According to the annual report filed on Form 10-K/A with the SEC on April 29, 2024 (the "2023 10-K"), for the 2023 fiscal year, Defendant Collins received $2,479,319.00 in total compensation from the Company. As of March 31, 2024, Defendant Collins beneficially owned 135,098 shares of LivePerson common stock.

25.     Defendant Block served as a director of LivePerson from 2010 until August 4, 2022. During his tenure on the Board, Defendant Block was a member of the Compensation Committee. According to the proxy statement filed on Schedule 14A with the SEC on July 21, 2022 (the "2022 Proxy Statement"), for the 2021 fiscal year, Defendant Block received $257,684.00 in total compensation from the Company.

26.     Defendant Cu served as a director of the Company from April 2021 until his resignation on February 7, 2023. According to the 2022 Proxy Statement, for the 2022 fiscal year, Defendant Cu received $200,010.00 in total compensation from LivePerson.

27.     Defendant Hansen has served as a director of LivePerson since December 2022. Defendant Hansen serves as a member of both the Audit Committee and Operating Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Hansen received $367,847 in total compensation from the Company. As of March 31, 2024, Defendant Hansen beneficially owned 25,063 shares of LivePerson common stock.

28.     Defendant Lavan has served as a director of the Company since January 2000. Defendant Lavan serves as a member of the Compensation Committee, the Operating Committee, the Nominating and Corporate Governance Committee, and as Chair of the Audit Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Lavan received $267,503 in total compensation from the Company. As of March 31, 2024, Defendant Lavan beneficially owned 189,041 shares of LivePerson's common stock.

29.     Defendant Layfield has served as Chair of the Board since July 2023 and as a Company director since November 2016. Layfield serves as a member of the Audit Committee, Nominating and Corporate Governance Committee, and as Chair of the Compensation Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Layfield received $328,336 in

total compensation from the Company. As of March 31, 2024, Defendant Layfield beneficially owned 155,971 shares of LivePerson's common stock.

30.     Defendant Mossler served as a director of LivePerson from 2017 until October 5, 2023. Mossler served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, for the 2022 fiscal year, Defendant Mossler received $257,010.00 in total compensation from the Company.

31.     Defendant Pegueros has served as a director of the Company since December 2022. Defendant Pegueros serves as a member of the Compensation Committee, Nominating and Corporate Governance Committee, and as Chair of the Operating Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Pegueros received $379,597 in total compensation from the Company. As of March 31, 2024, Defendant Pegueros beneficially owned 30,112 shares of LivePerson's common stock.

32.     Defendant Wesemann has served as a director of LivePerson since November 2004. Defendant Wesemann serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Wesemann received $265,836 in total compensation from the Company. As of March 31, 2024, Defendant Wesemann beneficially owned 500,971 shares of LivePerson's common stock.

33.     Defendant Zheng has served as a director of LivePerson since December 2022. Defendant Zheng serves as a member of the Audit Committee and the Compensation Committee. According to the 2023 10-K, for the 2023 fiscal year, Defendant Zheng received $370,375 in total compensation from the Company. As of March 31, 2024, Defendant Zheng beneficially owned 28,063 shares of LivePerson's common stock.

34.     Non-Party John Sabino ("Sabino") has served as the Company's CEO and as a member of the Board since January 2024. According to the Employment Agreement between Sabino and LivePerson dated December 27, 2023, Sabino receives an annual salary of $550,000.00 from the Company. Sabino is named solely for the purposes of demand futility.

35.     Non-Party Jim Miller ("Miller") has served as a member of the Board since February 2023. According to the 2023 10-K, for the 2023 fiscal year, Miller received $360,934 in total compensation from the Company. Miller is named solely for the purposes of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors, and/or fiduciaries of LivePerson and because of their ability to control the business and corporate affairs of LivePerson, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

37.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

38.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

39.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

40.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

### THE COMPANY'S CODE OF CONDUCT

41.    The Company maintains a Code of Conduct, which states that the Board:

adopted this Code of Conduct as a set of guidelines for Company employees, officers, directors and consultants, intended to focus the Board of Directors and the Company's management on areas of ethical risk, provide guidance to personnel to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help to foster a culture of honesty and accountability.

42.    The Code of Conduct states as follows:

We expect each of our employees, officers and directors to read and understand

this Code of Conduct and to abide by it. The Company expects its consultants to generally abide by this Code of Conduct as well. Those who violate this Code of Conduct will be subject to disciplinary action, up to and including termination.

43.    With respect to "Promotion of Ethical Behavior Through Discussion, Compliance and Reporting -- Reporting Any Illegal or Unethical Behavior," the Code of Conduct provides:

> Employees, officers and directors should strive to identify and raise potential issues before they lead to problems, and should ask a supervisor, manager or other appropriate personnel about the application of this Code of Conduct whenever in doubt. An employee, officer or director who becomes aware of any existing or potential violation of this Code of Conduct or any other illegal or unethical behavior by any officer, director or employee or by anyone purporting to be acting on the Company's behalf should promptly notify the General Counsel, the Chief Executive Officer, the Chief Financial Officer or the Chairperson of the Audit Committee (the "Audit Committee") of the Board of Directors (collectively, the "Compliance Team").
>
> Any employee, officer or director can also anonymously report the existing or potential violation by delivering the report via regular mail to c/o Audit Committee, LivePerson, Inc., 475 Tenth Avenue, Fifth Floor, New York, New York 10018. See the Company's Whistleblower Policy for more information about making anonymous reports about accounting and financial matters.

44.    Under a section titled "Conflicts of Interest," the Code of Conduct states:

> A "conflict of interest" occurs when an individual's private interest interferes in any way – or even appears to interfere – with the interests of the Company as a whole. While our employees, officers and directors are free to make personal investments and enjoy social relations and normal business courtesies, they must not have any personal interests that adversely influence the performance of their job responsibilities. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest also arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company, whether received from the Company or a third party. Gifts to, loans to, or guarantees of obligations of, employees, officers and directors and their respective family members may create conflicts of interest. Federal law prohibits personal loans from the Company to directors and executive officers. In addition, in general, it is a conflict of interest for a Company employee or officer to work simultaneously for a competitor, customer or supplier absent an express written consent or waiver from the Company. Conflicts of interest also arise when

employees have a direct or indirect ownership in a non-public company that is a competitor of the Company or is doing business with the Company.

Conflicts of interest are prohibited as a matter of Company policy, unless they have been approved by the Company. Service to the Company should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided. Conflicts are not always clear-cut. Any employee, officer or director who becomes aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest, or has a question as to a potential conflict, should discuss the matter promptly with a member of the Compliance Team.

45.    Under a section titled "Fair Dealing," the Code of Conduct states:

The Company does not seek competitive advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's clients, service providers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair-dealing practice. Stealing proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.

46.    Regarding "Protection and Proper Use of Corporate Assets," the Code of Conduct states:

In carrying out their duties and responsibilities, employees, officers and directors should protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Company assets, such as facilities, supplies, materials, intellectual property, information and other assets owned or leased by the Company, or that are otherwise in the Company's possession, should be used only for legitimate business purposes of the Company. Incidental personal use may be appropriate for certain Company assets, but an employee should check with a supervisor to determine what may be appropriate.

47.    With respect to "Full, Fair, Accurate, Timely and Understandable Disclosure," the Code of Conduct states:

It is the Company's policy to make full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, any other applicable federal or state agency, and in other public communications made by the Company. All

employees, officers and directors should promptly bring to the attention of the Audit Committee any material information of which they may become aware that affects the disclosures made by the Company in its public filings or otherwise.

Depending on their respective positions with the Company, employees, officers or directors may be called upon to provide information necessary to assure that the Company's public reports meet these requirements. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

48.    Further, under a section titled "Compliance with Laws, Rules and Regulations,"

the Code of Conduct states:

All employees, officers and directors of the Company must comply with all of the laws, rules and regulations of the United States and other countries, as well as the states, counties, cities and other jurisdictions, applicable to the Company or its business and refrain from any form of illegal, dishonest or unethical conduct. As a public reporting company with its stock trading on Nasdaq, the Company is also subject to the applicable listing standards of the Nasdaq Global Select Market.

This Code of Conduct does not attempt to summarize all laws, rules and regulations applicable to the Company or its business. You should consult the various guidelines the Company has prepared on specific laws, rules and regulations, which you can find summarized in the Employee Handbook, including employment laws concerning equal employment and sexual and other types of harassment; immigration laws concerning hiring of documented workers; antitrust laws; environmental laws; occupational health and safety laws; food and drug laws; securities laws concerning disclosure requirements and insider trading; and anti- bribery laws including foreign corrupt practices. Employees should consult with a supervisor if they have questions about laws they think may be applicable to the Company or its business.

Generally, it is both illegal and against Company policy for any employee, officer or director who is aware of material nonpublic information relating to the Company to buy or sell any securities of the Company, or recommend that another person buy, sell or hold the securities of the Company. More detailed rules governing the trading of securities by the Company's employees, officers and directors are set forth in the Company's Insider Trading Policy. Any employee, officer or director who is uncertain about the legal rules involving his or her purchase or sale of any Company securities should consult with the Company's Insider Trading Compliance Officer (currently the General Counsel) before making any such purchase or sale.

49.    Regarding "Accounting Complaints," the Code of Conduct states:

The Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters. Employees, officers or directors who have concerns or complaints regarding such matters are encouraged to promptly submit those concerns or complaints to the Audit Committee, which, subject to its duties arising under applicable law, regulations and legal proceedings, will treat such submissions confidentially. Such submission may be directed to c/o Audit Committee, LivePerson, Inc., 475 Tenth Avenue, Fifth Floor, New York, New York 10018. See the Company's Whistleblower Policy for more information about making anonymous reports about accounting and financial matters. No one will be subject to retaliation because of a good faith report of a suspected violation.

50.    Moreover, under a section titled "Authority to Grant Waivers," the Code of Conduct states:

From time to time, the Company may waive certain provisions of this Code of Conduct. Any employee, officer or director who believes that a waiver may be called for should discuss the matter with a member of the Compliance Team. Waivers for executive officers (including senior financial officers) or directors of the Company may be made only by the Board of Directors.

## THE COMPANY'S CODE OF ETHICS

51.    The Company also maintains a Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"), which states that the "Board of Directors is responsible for setting the standards of conduct contained in this Code of Ethics and for updating these standards as appropriate to reflect legal and regulatory developments."

52.    According to the Code of Ethics, LivePerson's directors adopted the Code of Ethics to:

promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company; compliance with applicable governmental rules and regulations; the prompt internal reporting of violations of the Code of Ethics to an appropriate person or

persons identified herewith and accountability for adherence to this Code of Ethics.

53. The Code of Ethics provides that the Company's CEO and Senior Financial Officers are "bound by the requirements and standards of both the Company's Code of Conduct and this Code of Ethics, as well as those set forth in all other applicable policies, procedures and guidelines provided by the Company to employees."

54. Further, the Code of Ethics requires the Individual Defendants to:

- Endeavor to act with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, as further discussed in the Code of Conduct, and the observance of both the form and the spirit of technical and ethical compliance and accounting standards.

- Act in good faith, responsibly, and with due care, competence and diligence, without misrepresenting or omitting material facts or allowing one's independent judgment to be compromised.

- Promote full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission or other applicable federal, foreign or state agency, and in other public communications made by the Company, and to promptly bring to the attention of the Audit Committee of the Board of Directors (the "Audit Committee") any material information of which they may become aware that affects the disclosures made by the Company in its public filings or otherwise.

- Promptly bring to the attention of the Audit Committee any information they may have concerning: (a) significant deficiencies in the Company's disclosure controls and procedures that could adversely affect the Company's ability to record, process, summarize and report, within the time periods specified in the Securities and Exchange Commission's or other applicable federal, foreign or state agency's rules and forms, the information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure; or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, internal control over financial reporting or disclosure controls and procedures.

- Endeavor to comply, and to cause the Company to comply, with applicable governmental laws, rules and regulations and promptly bring to the attention of the Audit Committee any information they may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

- Accept accountability for adherence to this Code of Ethics, including promptly reporting to the Audit Committee any information they may have concerning evidence of a material violation of this Code of Ethics.

55.    In addition, the Code of Ethics states:

The Chief Executive Officer and Senior Financial Officers are expected to adhere to this Code of Ethics. The Company shall determine appropriate actions to be taken in the event of violations of this Code of Ethics by any of these employees and as set forth in the Company's Code of Conduct. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code of Ethics. Waivers of this Code of Ethics may only be made by the Board of Directors. The Company will also appropriately disclose any substantive amendment to, and any material waiver of, any provision of this Code of Ethics that applies to these employees pursuant to the Exchange Act and the applicable rules of each stock exchange on which the Company's shares are listed or quoted.

## **THE COMPANY'S AUDIT COMMITTEE CHARTER**

56.    The Company also maintains an Audit Committee Charter, which states that the

role of the Audit Committee is to "oversee the financial reporting and disclosure process" and:

the accounting and financial reporting processes of the Company and audits of its financial statements; the effectiveness of the Company's internal control over financial reporting, including the performance of the Company's internal audit function; the Company's compliance with legal and regulatory, accounting and financial reporting requirements, including internal controls and whistle-blower procedures designed for that purpose and its Code of Conduct and its Code of Ethics for the Chief Executive Officer and Senior Financial Officers, and programs established in accordance therewith; the Company's independent registered public accounting firm's qualifications, performance and independence; and the Company's enterprise risk management framework and its policies and procedures for risk management.

57.    Under a section titled "Authority and Responsibility," the Audit Committee

Charter states that the Audit Committee is charged with:

9. Review with management any significant changes to GAAP, SEC and other accounting policies or standards that will impact or could impact the financial reports under review. 10. Review significant changes to the Company's accounting principles and practices proposed by the independent auditor, the internal auditor, if any, or management. . . .

11. Instruct the independent auditor and the internal auditor, if any, to advise the Audit Committee if there are any subjects that require special attention.

12. Instruct the independent auditor to report to the Audit Committee on all critical accounting policies of the Company, all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor, and other material written communication between the independent auditor and management, and discuss these matters with the independent auditor and management.

13. Meet with management and the independent auditor to discuss the annual financial statements, Management's Discussion and Analysis of Financial Condition and Results of Operations, and the report of the independent auditor with respect to such annual financial statements and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; significant disagreements with management; the adequacy of internal controls, including any special steps adopted in light of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting identified during the course of the annual audit, and the adequacy of disclosures about changes in internal control over financial reporting; the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC; any items the Company's independent auditor is required to communicate in accordance with auditing procedures and standards; and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the SEC or in any public disclosure or release; as well as management's response to such matters. . . .

18. Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

19. Discuss with management any evidence of a material violation of the

Company's Code of Conduct, or the Company's Code of Ethics for the Chief Executive Officer and Senior Financial Officers, or programs established in connection therewith, including evidence of a material violation of securities laws or breaches of fiduciary duty by the Company. . . .

21. Have such direct and independent interaction with members of management, including the Company's Chief Financial Officer and the senior internal audit executive, if any, as the Audit Committee believes appropriate.

22. Review and discuss with management and the independent auditor management's report on internal control over financial reporting, and the independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, prior to the filing of the Form 10- K.

23. Following review and discussions, if so determined by the Audit Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

24. Generally review and discuss the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies.

25. Discuss with management and the independent auditor the quarterly financial statements prior to the filing of the Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; provided that this responsibility may be delegated to the chairman of the Audit Committee or a member of the Audit Committee who is a financial expert. . . .

31. Periodically review and discuss with the Company's General Counsel any legal matter, including legal cases against or regulatory investigations involving the Company or material violations of the Company's Code of Business Conduct and Ethics or programs established in connection therewith, that could have a significant impact on the Company's financial statements.

32. Discuss with the Company's lead inside or outside legal counsel any legal matters that may have a material impact on the financial statements or the Company's compliance policies.

33. Discuss with the independent auditor and management the Company's risk assessment and risk management guidelines, policies and processes.

34. On behalf of the Board, oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks, and credit and liquidity

risks.

## SUBSTANTIVE ALLEGATIONS

Q1 2022 Quarterly Report

58.     On May 10, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2022 (the "Q1 2022 Quarterly Report"), which was signed by Defendants LoCascio and Collins.  The Q1 2022 Quarterly Report contained certifications, signed by Defendants LoCascio and Collins, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to its accuracy and disclosure of all weaknesses in internal controls.

59.     The Q1 2022 Quarterly Report stated the following regarding the sufficiency of LivePerson's internal controls:

> **Item 4. Controls and Procedures**
>
> *Evaluation of Disclosure Controls and Procedures*
>
> ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.
>
> *Changes in Internal Control Over Financial Reporting*
>
> There were no changes in our internal control over financial reporting during the three months ended March 31, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.[1]

2022 Proxy Statement

60.     On July 21, 2022, LivePerson filed the 2022 Proxy Statement with the SEC. The

2022 Proxy Statement was solicited by Defendants Block, Cu, Lavan, Layfield, LoCascio Mossler, and Wesemann and called for shareholder approval of, among other things: (i) the reelection of Defendants Cu, Layfield, and Wesemann to the Board; (ii) the ratification of the appointment of BDO USA, LLP as LivePerson's independent registered public accounting firm for FY2022; and (iii) the approval, by advisory vote, of the compensation of the named executive officers of LivePerson.

61.     Regarding LivePerson's Risk Oversight, the 2022 Proxy Statement provided:

The Board provides oversight of the Company's management of risk. Senior management has responsibility for the management of risk and reports to the Board as needed with respect to its ongoing enterprise risk management efforts. Given the heightened importance and relevance of risks related to privacy, data use and cybersecurity, the Board as a whole oversees management of these risks. In exercising its oversight of risk management, the Board has delegated to the Audit Committee primary responsibility for the oversight of risks related to the Company's financial statements, internal controls, disclosure controls, and related processes. As discussed in more detail below, the Board has delegated to the Compensation Committee primary responsibility for the oversight of risk related to the Company's compensation policies and practices. The Board has delegated to the Nominating and Corporate Governance Committee primary responsibility for the oversight of risk related to the Company's corporate governance practices. Each committee reports as needed to the full Board with respect to such committee's particular risk oversight responsibilities.

62.     With respect to the Code of Conduct and Code of Ethics, the 2022 Proxy Statement provided:

The Board has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, corporate governance policies, and standards applicable to us in general. In addition, the Board has adopted a Code of Conduct applicable to all of our employees, including our executive officers, and our non-employee directors, as well as a Code of Ethics for the Chief Executive Officer and Senior Financial Officers.

63.     The 2022 Proxy Statement was materially false and misleading as it failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight

function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising those functions, were causing and/or permitting LivePerson to issue false and misleading statements, and were not complying with the Code of Conduct or the Code of Ethics.

64.    Furthermore, the 2022 Proxy Statement failed to disclose, among other things, that: (1) LivePerson's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) LivePerson failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, LivePerson failed to disclose the suspension of WildHealth's Medicare reimbursements under the Program and the corresponding impact on the Company's future revenues; and (4) as a result of the foregoing, LivePerson overstated its business prospects and overall financial position.

65.    Accordingly, Defendants' statements regarding the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

Q2 2022 Quarterly Report

66.    On August 9, 2022, LivePerson filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "Q2 2022 Quarterly Report"). The Q2 2022 Quarterly Report was signed by Defendants Collins and LoCascio and contained SOX certifications attesting to its accuracy, which were also signed by Defendants LoCascio and Collins.

67.    With respect to LivePerson's internal controls, the Q2 2022 Quarterly Report provided:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

*Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2022* to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended June 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

November 2022 Press Release

68.    On November 7, 2022, LivePerson issued a current report on Form 8-K with the SEC, appended to which was a press release (the "November 2022 Press Release") announcing the Company's financial results for the third quarter of 2022.  The press release stated that LivePerson expected strong performance from WildHealth, specifically:

*As for guidance, we expect continued strong performance by WildHealth and elevated professional services in the fourth quarter.  Considering those expectations, coupled with more upsells and early renewals in the third quarter than previously expected, we are raising revenue guidance for the full year.* We now expect revenue in a range of $517 million to $521 million, or 10% to 11% year over year growth, an improvement to the midpoint of approximately $6 million. For full year adjusted EBITDA, due to our current expectation for potential revenue upside and additional P&L optimizations, we are reaffirming our previous guidance range of $1 million to $10 million.

Q3 2022 Quarterly Report

69.    On November 8, 2022, LivePerson filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "Q3 2022 Quarterly Report").  The Q3 2022 Quarterly Report was signed by Defendants Collins and LoCascio and contained SOX certifications attesting

to its accuracy, which were also signed by Defendants LoCascio and Collins.

70.    With respect to LivePerson's internal controls, the Q3 2022 Quarterly Report stated:

### Item 4. Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

**Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2022** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended September 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

71.    The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about LivePerson's business, operations, and prospects. Specifically, the statements failed to disclose that: (1) LivePerson's internal controls regarding disclosure controls and procedures were materially ineffective; (2) LivePerson failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, LivePerson failed to disclose the suspension of WildHealth's Medicare reimbursements under the Program and the corresponding impact on the Company's future revenues; and (4) as a result of the foregoing, LivePerson overstated its business prospects and overall financial position.

### **THE TRUTH EMERGES**

72.     On February 28, 2023, LivePerson filed a Notification of Late Filing on Form

12b-25 with the SEC, disclosing that LivePerson would be unable to timely file its 2022 Annual

Report on Form 10-K with the SEC.  The Form 12b-25 provided:

> **The Company has determined that it is unable to file its Form 10-K within the prescribed time period provided by the applicable rules of the Securities and Exchange Commission without unreasonable effort and expense.**
>
> **In view of the in-process integration of the Company's 2022 acquisition of WildHealth, the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures.**
>
> The Company currently anticipates filing its Form 10-K for the year ended December 31, 2022 within the fifteen calendar day grace period provided by Rule 12b-25.

73.     On this news, the Company's stock price fell $1.69 per share, or 14.31%, from a

closing price of $11.81 per share on February 27, 2023 to a closing price of $10.12 per share on

February 28, 2023.

74.     Then, on March 6, 2023, the Company filed a current report on Form 8-K with the

SEC, which disclosed to investors that:

> On February 28, 202[3], LivePerson, Inc. (the "Company") filed a Notification of Late Filing on Form 12b-25 stating it was unable to file its Form 10-K for the year ended December 31, 2022 within the prescribed time period without unreasonable effort or expense because it required additional time to complete a review of revenue associated with a recently discontinued program of its subsidiary Wild Health, and to complete its in-process review of internal controls and procedures.
>
> **To provide additional clarity to investors, the Company notes that the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review.**
>
> The Company currently anticipates filing its Form 10-K for the year ended

December 31, 2022 within the fifteen calendar day grace period provided by Rule 12b-25.

75.     On this news, the Company's stock price fell $0.78 per share, or 6.8%, from a closing price of $11.47 per share on March 6, 2023 to a closing price of $10.69 per share on March 7, 2023.

76.     On March 15, 2023, the Company issued a press release announcing LivePerson's financial results for the fourth quarter of 2022.  The press release provided:

**Fourth Quarter Highlights**

***Total revenue was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period last year*** as the company continues to execute on its plan to exit non-core lines of business. ***Within total revenue, business operations revenue for the fourth quarter of 2022 decreased 1% from the comparable prior-year period to $113.0 million, and revenue from consumer operations decreased 3% from the comparable prior-year period to $9.4 million.***

77.     The next day, March 16, 2023, the Company filed the 2022 10-K, which stated the following:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures," as that term is defined in Rule 13a-15(e) promulgated under the Exchange Act, as of December 31, 2022.

Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, due to certain control deficiencies which aggregated to a material weakness in the Company's internal control over financial reporting as further described below, our disclosure controls and procedures were not effective as of December 31, 2022.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management evaluated the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the framework established

in "Internal Control — Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). *As a result of its review, management identified deficiencies in the Company's internal control over financial reporting as of December 31, 2022 that in the aggregate constitute a material weakness as further discussed below. As a result, our management concluded that as of December 31, 2022, our internal control over financial reporting was not effective.*

*The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth, which was acquired in February 2022, and primarily include a combination of ineffective operation of controls and inadequate controls related to: formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries.*

78.     On this news, the Company's stock price fell $5.64 per share, or 57.73%, from a closing price of $9.77 per share on March 15, 2023 to a closing price of $4.13 per share on March 16, 2023.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE STOCK WHILE THE STOCK WAS ARTIFICIALLY INFLATED

79.     As a result of the above false and misleading statements, the Company's share price was artificially inflated. During the Relevant Period, while the Company's stock price was artificially inflated, the Individual Defendants caused LivePerson to repurchase the Company's own common stock at significant cost to LivePerson.

80.     According to the 2022 10-K, between November 1, 2022 and November 30, 2022, LivePerson spent over $221,301.00 to repurchase approximately 19,830 shares of its common stock at the artificially inflated price of $11.17 per share. The 2022 10-K specified that the repurchased shares were vested from Defendant Collins.

81.     Because LivePerson's stock was actually worth only $4.13 per share, the price at

closing on March 16, 2023, LivePerson overpaid by approximately $139,403.00 for the repurchases of stock from Defendant Collins.

## DAMAGES TO LIVEPERSON

82.     As a direct and proximate result of the Individual Defendants' misconduct, LivePerson has expended and will continue to expend many millions of dollars.

83.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

84.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

85.     As a direct and proximate result of the Individual Defendants' conduct, LivePerson has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, violations of federal law, and other wrongful conduct alleged herein by the Individual Defendants.

87.     LivePerson is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

88.     Plaintiff is a current shareholder of LivePerson and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.

89.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

90.     A pre-suit demand on the Board of LivePerson is futile and, therefore, excused. At the time this suit was filed, the Board consisted of the following eight individuals: Defendants Hansen, Lavan, Layfield, Pegueros, Wesemann, and Zheng (the "Director Defendants"), as well as non-parties Miller and Sabino (together with the Director Defendants, the "Directors"). Plaintiff is required to show that four of the current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

91.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

92.     The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

93.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

94.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

95.    As a result, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and, thus, excused.

96.    Additional reasons that demand upon Defendant Hansen is futile follow. Defendant Hansen has served as a director of the Company since December 2022. Defendant Hansen serves as a member of the Audit Committee and Operating Committee. The Company provides Defendant Hansen with significant compensation as detailed above. As a director, Defendant Hansen conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, Defendant Hansen breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Hansen is futile and excused.

97.    Additional reasons that demand upon Defendant Lavan is futile follow. Defendant Lavan has served as a director of the Company since January 2000. Defendant Lavan serves as a member of the Compensation Committee, the Operating Committee, the Nominating and Corporate Governance Committee, and as Chair of the Audit Committee. The Company provides Defendant Lavan with significant compensation as detailed above. Moreover, he solicited the false

and misleading 2022 Proxy Statement. As a director, Defendant Lavan conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, Defendant Lavan breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Lavan is futile and excused.

98.    Additional reasons that demand upon Defendant Layfield is futile follow. Defendant Layfield has served as Chair of the Board since July 2023 and as a director since November 2016. Defendant Layfield serves as a member of the Audit Committee, the Nominating and Corporate Governance Committee, and as Chair of the Compensation Committee. The Company provides Defendant Layfield with significant compensation as detailed above. As Chair of the Board, Defendant Layfield conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Layfield also solicited the false and misleading 2022 Proxy Statement, which led to her re-election to the Board. As a result, Defendant Layfield breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Layfield is futile and excused.

99.    Additional reasons that demand upon Defendant Pegueros is futile follow. Defendant Pegueros has served as a director of the Company since December 2022. Defendant Pegueros serves as a member of the Compensation Committee, the Nominating and Corporate Governance Committee, and as Chair of the Operating Committee. The Company provides Defendant Pegueros with significant compensation as detailed above. As a director, Defendant

Pegueros conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, Defendant Pegueros breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Pegueros is futile and excused.

100.    Additional reasons that demand upon Defendant Wesemann is futile follow. Individual Defendant Wesemann has served as director of the Company since November 2004. Defendant Wesemann serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. The Company provides Defendant Wesemann with significant compensation as detailed above. Defendant Wesemann also solicited the false and misleading 2022 Proxy Statement which led to his re-election to the Board. As a trusted director, Defendant Wesemann conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, Defendant Wesemann breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Wesemann is futile and excused.

101.    Additional reasons that demand upon Defendant Zheng is futile follow. Defendant Zheng has served as a director of the Company since December 2022. The Company provides Defendant Zheng with significant compensation as detailed above. Defendant Zheng serves as a member of the Audit Committee and Compensation Committee. As a director, Defendant Zheng conducted little, if any, oversight of the scheme to cause the Company to make false and

misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, Defendant Zheng breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon Defendant Zheng is futile and excused.

102.    Additional reasons that demand on Sabino is futile follow. Sabino is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with LivePerson, rendering him not independent. As such, Sabino cannot independently consider any demand to sue himself for breaching his fiduciary duties to LivePerson, because that would expose him to liability and threaten his livelihood. As such, Sabino could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Sabino is therefore futile.

103.    Additional reasons that demand on Marrs is futile follow. Miller has served as a member of the Board since February 2023. The Company provides Miller with significant compensation as detailed above. As such, Miller cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Miller's compensation. Miller therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Miller is thus futile.

104.    Furthermore, three of the Director Defendants solicited the 2022 Proxy Statement to call for a stockholder vote to, among other things, re-elect themselves to the Board, allowing them to continue breaching their fiduciary duties.

105.    Furthermore, each of the Director Defendants, individually and collectively, faces

a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by thousands of dollars for its own common stock during the Relevant Period from Individual Defendant Collins. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by LivePerson and nevertheless approved the repurchases. Accordingly, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and, thus, excused.

106.    Defendants Lavan, Layfield, and Wesemann (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately exercise their risk management and risk assessment functions and failing to ensure adequate Board oversight of LivePerson's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct and the Code of Ethics. Accordingly, the Audit Committee Defendants breached their fiduciary duties and are not disinterested or independent. Thus, demand is further excused and futile as to the Audit Committee Defendants.

107.    In violation of the Code of Conduct and the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. The Individual Defendants breached the Code of Conduct and the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were

accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct, the Code of Ethics, and the law. Accordingly, the Director Defendants breached the Company's own Code of Conduct and the Code of Ethics, are not disinterested, and demand is excused as to them.

108.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. However, the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for the Company any part of the damages it suffered and will continue to suffer thereby. Therefore, any demand upon the Director Defendants would be futile.

109.    The Individual Defendants' conduct described herein could not have been the product of legitimate business judgment because it was based on bad faith and intentional, reckless, and/or disloyal misconduct. Accordingly, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). Because a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment regarding whether to pursue this action on behalf of the Company's stockholders. Therefore, demand is excused as being futile.

110.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and the acts are incapable of ratification.

111.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to LivePerson's stockholders. If there is a directors' and officers'

liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by LivePerson against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." Thus, if the Director Defendants sued themselves or certain of the Company's officers, there would be no directors' and officers' insurance protection. Therefore, the Director Defendants cannot be expected to bring such a suit. However, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to obtain a recovery. Accordingly, demand on the Director Defendants is futile and, therefore, excused.

112.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein because, if they did, they would face a large uninsured individual liability. Therefore, demand is futile.

113.    For all of the above reasons, all of the Director Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

## <u>COUNT ONE</u>

### Against the Individual Defendants for Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

116.    The Individual Defendants, individual and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded to be misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LivePerson not misleading.

118.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by LivePerson.

119.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

120.    As a result of the foregoing, the market price of LivePerson common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of

LivePerson common stock in purchasing LivePerson common stock at prices that were artificially inflated as a result of the false and misleading statements and was damaged thereby.

121.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

122.    Plaintiff on behalf of LivePerson has no adequate remedy at law.

## COUNT TWO

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

123.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

125.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his or her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

126.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

127.    Under the direction and watch of the Individual Defendant, the Proxy Statement failed to disclose, among other things, that: (1) LivePerson's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) LivePerson failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, LivePerson failed to disclose the suspension of WildHealth's Medicare reimbursements under the Program and the corresponding impact on the Company's future revenues; and (4) as a result of the foregoing, LivePerson overstated its business prospects and overall financial position.

128.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, ratification of the conditions to lead to the consummation of the Merger.

130.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

131.    Plaintiff on behalf of LivePerson has no adequate remedy at law.

**COUNT THREE**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    The Individual Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act.

134.    The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

135.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## <u>COUNT FOUR</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

138.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

139.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the

Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

141. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT FIVE

### Against the Individual Defendants for Unjust Enrichment

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LivePerson.

144. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from LivePerson that was

tied to the performance or artificially inflated valuation of LivePerson, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and a representative of LivePerson, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

146.    Plaintiff on behalf of LivePerson has no adequate remedy at law.

<u>**COUNT SIX**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

149.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

150.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

151.    Plaintiff on behalf LivePerson has no adequate remedy at law.

<u>**COUNT SEVEN**</u>

**Against Individual Defendants Collins and LoCascio for Contribution Under Sections 10(b) and 21D of the Exchange Act**

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    The Company and Individual Defendants Collins and LoCascio are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

148.    If and when LivePerson is found liable in the Securities Class Action for those violations of the Exchange Act, LivePerson's liability will be in whole or in part due to Collins' and LoCascio's willful and/or reckless violations of their duties as officers and/or directors of LivePerson.

149.    Defendants Collins and LoCascio, due to their positions of control and authority as officers and/or directors of LivePerson, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

150.    Accordingly, Collins and LoCascio are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

151.    Accordingly, the Company is entitled to receive all appropriate contribution or indemnification from Collins and LoCascio.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of LivePerson

and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of LivePerson for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.    Awarding LivePerson restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the events described above, including, *inter alia*, a stockholder vote on the following resolutions for amendments to LivePerson's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2.    A provision to permit the stockholders to nominate at least four candidates for election to the Board; and

3.    A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.    Awarding punitive damages;

F.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: July 12, 2024

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

*s/ Matthew M. Guiney*
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
Email: guiney@whafh.com

*Counsel for Plaintiff*

VERIFICATION

I, Carlos Morales am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.   As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed: 6/26/2024

Carlos Morales
— 6CA9B3B557C0468...

Carlos Morales